## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH AND SEIZURE WARRANT

I, Kevin M. Mondragon, Special Agent of the Drug Enforcement Administration (DEA), being

duly sworn, state as follows:

### INTRODUCTION

1.      I have been employed as a Special Agent of DEA since October 2010, and I am assigned to

the DEA's Albuquerque Office.  Prior to employment with the DEA, I was employed as a State

Police Officer with the New Mexico State Police.   I am an investigative law enforcement officer

of the United States within the meaning of section 2510(7) of Title 18, United States Code, as a

Special Agent of the Drug Enforcement Administration (DEA).  As such, I am empowered to

conduct investigations of and to make arrests for offenses enumerated in Title 21, United States

Code, Sections 841 and 881.

2.      I have participated in an ongoing investigation regarding the distribution of illegal

narcotics in and around Taos County, New Mexico.  Since the investigation's inception, I as well

as other DEA Special Agents and law enforcement officials from other agencies have obtained

information regarding a drug trafficking organization (DTO) that formed around the nucleus of the

ELIAS ROMERO family in the 1990s.  Although ELIAS ROMERO reportedly no longer

participates in the ROMERO DTO due to failing health, that organization has endured under the

leadership of IVAN ROMERO and RICCO ROMERO.  While the ROMERO DTO has trafficked

in various controlled substances, heroin has been the its drug of choice in recent years; over the

past several years, the ROMERO DTO has attempted to control and monopolize the distribution of

heroin in Taos County.  In addition to family members, ROMERO DTO includes other members

and associates who have conspired with IVAN ROMERO and RICCO ROMERO to acquire,

1

possess and distribute heroin and other controlled substances.  One such co-conspirator is
RICHARD SANCHEZ (a.k.a. "Ricky").

3.      I am submitting this Affidavit in support of an application for a warrant to search premises
at---

      a.      1103 A, Quintana Lane, El Prado, New Mexico (RICCO ROMERO's residence
            further described in Appendix A),

      b.      505 Upper Ranchitos Road, Taos, New Mexico (RICKY SANCHEZ' residence
            further described in Appendix B), and

      c.      a 2008 Dodge Avenger displaying New Mexico registration plate MGT-473
            (a motor vehicle used by RICCO ROMERO further described in Appendix C),

for evidence, contraband, fruits and instrumentalities of violations of  21 U.S.C. §§ 841(a)(1) and
846 (further described in Appendix D).

4.      The facts and circumstances summarized in this Affidavit are based on my personal
participation in this investigation; information provided by other Special Agents, Task Force
Agents, and law enforcement officers (collectively referred to as the "Agents") from various
federal, state, and local law enforcement agencies; my experience and training as a DEA Special
Agent.  When I recount that a statement was made, I either have direct knowledge of the statement
or the information was provided by another law enforcement agent (who may have had either
direct or hearsay knowledge of the statement) and I have spoken to the agent or read the agent's
report.

5.      Further, inferences drawn in this Affidavit are based on my professional experience and
training.  Over the course of my career as federal and state law enforcement officer, I have
accumulated the following training and experience.

a.  I graduated from the DEA Academy (Quantico, Virginia).  I received approximately 19 weeks of specialized narcotics related training.  The training included controlled substance identification, narcotics related investigative techniques, interview and interrogation training, preparation of search warrants, tactical applications of narcotics enforcement, surveillance and electronic monitoring techniques, money laundering investigations and various forensic subjects including latent fingerprint collection and analysis.

b.  As a State Police Officer and DEA Special Agent, I have participated in numerous investigations of individuals and organizations trafficking heroin, cocaine, cocaine base ("crack"), marijuana, methamphetamine and other controlled substances as defined in 21 U.S.C. § 801.  My experience as a Special Agent includes, but is not limited to, conducting surveillance; interviewing witnesses; participating in arrests, searches, and seizures; working in an undercover capacity and working with informants, writing wiretap affidavits, and working money laundering cases.  I have received training and experience in the investigation of violations of the federal drug and money laundering laws.  I have participated in the investigation of several drug trafficking conspiracies.  As a result, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions.

6.  This Affidavit is submitted for the limited purpose of establish probable cause to support the issuance of a warrant to search for and seize property or money described below.  I have therefore not included each and every fact known to him concerning this investigation, and this

3

Affidavit does not contain all of my knowledge about this matter.

## FACTS & CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

### Background of Investigation

7.      Since 2011, I have participated in an investigation of the illegal drug trafficking activities of the ROMERO DTO in Taos County, New Mexico. I have interviewed multiple confidential sources and sources of information and or have obtained investigative reports from local law enforcement officers detailing the illegal activities of the IVAN ROMERO's drug trafficking organization. These confidential sources and sources of information have been established to be reliable and accurate on multiple occasions. Additionally, I have corroborated the information provided by the confidential sources through investigative techniques and by law enforcement reports of other investigative agents.

8.      Human sources of information have disclosed that IVAN ROMERO and members of his family have been selling heroin in and around Taos, New Mexico, for many years.

     a.      A confidential source (CS#1) provided information from approximately 2012 to 2013 regarding drug trafficking activities in and around Taos, New Mexico. CS#1 provided information to the effect that IVAN ROMERO has been dealing large quantities of heroin for over ten years. CS#1 has also reported that RICCO ROMERO (one of IVAN ROMERO's brothers) is also involved in selling heroin. The information provided by CS#1 regarding IVAN ROMERO and other drug dealers has proven accurate over that span.

     b.      CS#2 provided information over a span of approximately seven months in 2014 regarding drug trafficking activities in and around Taos, New Mexico. CS#2

4

also provided information regarding IVAN ROMERO's drug trafficking activities.
Among other things, CS#2 reported IVAN ROMERO has been dealing heroin for
over ten years.  CS#2 has also identified RICCO ROMERO as a distributor of
heroin for IVAN ROMERO.  The information provided by CS#2 regarding IVAN
ROMERO and other drug dealers has proven accurate and reliable, and CS#2 also
provided information to the Taos Police Department which led to the arrests of
other persons for separate offenses.

c.      CS#3 provided information in 2011 for a span of approximately three
        months regarding drug trafficking activities in and around Taos, New Mexico.
        CS#3 provided information to the effect that IVAN ROMERO has been dealing
        cocaine and heroin for over fifteen years.  CS#3 additionally identified RICCO
        ROMERO as one of IVAN ROMERO's dealers or distributors of drugs.  CS#3 also
        stated that IVAN ROMERO's father, ELIAS ROMERO, had started the family's
        drug trafficking business approximately thirty years earlier.  CS#3 was also a CS
        for the Region I Task Force, and the information provided by CS#3 has proven to
        be accurate and reliable.

d.      A Source of Information (SOI#1) provided information to the Taos Police
        Department in 2014 for a two month period regarding criminal activities in and
        around Taos, New Mexico.  SOI#1 provided information regarding IVAN
        ROMERO's drug trafficking activities.  SOI#1's historic information regarding
        ROMERO was more limited than the information provided by other sources.
        SOI#1's provided information to the effect that IVAN ROMERO has been dealing
        heroin since 2011.  The information provided by SOI#1 regarding IVAN

ROMERO and other drug dealers has also proven to be accurate and reliable.

e.    Another Source of Information (SOI#2) was debriefed regarding the illegal drug trafficking activities of IVAN ROMERO in 2011. At that time, SOI#2 provided information to the effect that IVAN ROMERO was distributing heroin in and around Taos. SOI#2 also reported that WILMA ROMERO sold heroin for a short period of time during 2011. SOI#2's information has been corroborated by other information already established to be accurate and reliable.

f.    A third Source of Information (SOI#3) was recently debriefed regarding the illegal drug trafficking activities of IVAN ROMERO. SOI#3 has provided detailed information regarding the ROMERO drug trafficking organization ("DTO"). SOI#3 provided information to the effect that IVAN ROMERO has been dealing heroin in and around Taos since at least 2010. SOI#3 also reported that IVAN ROMERO's mother, WILMA ROMERO, actively participates in the DTO. SOI#3 reported that WILMA ROMERO conceals and maintains drug proceeds for IVAN ROMERO at her residence. SOI#3 reported that a man referred to as "Jurassic" has conspired with IVAN ROMERO to possess and distribute heroin, and that "Jurassic" transports heroin from sources of supply in Albuquerque, New Mexico, to the ROMERO DTO in Taos, New Mexico. SOI#3 investigators have identified "Jurassic" as JASON DURAN. SOI#3 reported that JASON DURAN typically transported between 1 to 2 pounds of heroin at a time from Albuquerque to Taos. SOI#3 provided information to the effect that JASON DURAN obtained much of the heroin that he transported to the ROMERO DTO from heroin suppliers in Albuquerque, New Mexico. SOI#3 is familiar with key members of the

6

ROMERO DTO, and I have been able to independently corroborate much of the information SOI#3 has provided. Further, the Taos County Sheriff's Department has also corroborated and utilized information by SOI#3 leading to the seizure of firearms. SOI#3's information to this date has proven to be accurate and reliable.

9.    The information provided by the CSs and SOIs regarding the drug trafficking activities of IVAN ROMERO and his family is also reflected in criminal records.

   a.    Criminal databases show that IVAN ROMERO was convicted of trafficking in controlled substances in Taos County in 1999 (a misdemeanor conviction for which he received a suspended sentence). In 2007, IVAN ROMERO was convicted of conspiring to commit a murder (second degree) that occurred in 2003 and which investigative reports show was related to a drug debt that the victim owed to IVAN ROMERO.

   b.    RICCO ROMERO's criminal history includes possession of drug paraphernalia (2004) and possession of marijuana and drug paraphernalia (2012).

   c.    Law enforcement databases reveal that WILMA ROMERO has a lengthy criminal history marked by multiple prior convictions for controlled substances offenses; WILMA ROMERO was convicted of controlled substance offenses in 1984, 1985, 1990, and 2000.

## Prior Searches & Seizures

10.   Acting upon information provided primarily by CS#1 regarding IVAN ROMERO's drug trafficking activities, I and other law enforcement authorities obtained a warrant from a state district court which authorized the search of IVAN ROMERO's residence. On or about April 2, 2015, Region III Narcotics Task Force, Taos County Sheriff's Department, the New Mexico State

Police, and DEA agents, executed that warrant at ROMERO's residence in Taos County, New Mexico. I assisted in the execution of that warrant. In the course of that search, agents seized: 305.2 grams (net weight) of heroin; marijuana; drug trafficking instruments, supplies and paraphernalia including several scales and a large quantity of small plastic baggies. Agents also found and seized approximately $64,920 in United States currency in the master bedroom of IVAN ROMERO's residence.

11.     On April 2, 2015, IVAN ROMERO was arrested and charged by State authorities with heroin trafficking. Following his arrest, IVAN ROMERO was charged with drug trafficking offenses in the State of New Mexico's Eighth Judicial District Court in Taos County, and his bond was set at $90,000.

12.     On April 3, 2015, RICCO ROMERO (IVAN ROMERO's brother), WILMA ROMERO and MELISSA ROMERO visited the People's Bank branch located at 1356 Paseo Del Pueblo Sur, Taos, New Mexico. People's Bank is insured by the Federal Deposit Insurance Corporation and is a financial institution as defined in 31 U.S.C. § 5312(a)(2).

  a.     That bank's surveillance video system recorded RICCO ROMERO enter the bank carrying a black bag or case accompanied by MELISSA ROMERO and WILMA ROMERO. RICCO ROMERO, WILMA ROMERO and MELISSA ROMERO presented $90,000 in United States currency which they exchanged for a bank check or cashier's check (#292931) subsequently used to post IVAN ROMERO's bond.

  b.     Upon receiving the $90,000 in bulk currency, bank employees noticed the money had an odd smell and it reportedly made bank employees' eyes "itch and burn." Employees of People's Bank set aside and secured the suspicious currency, and

8

they contacted law enforcement.  On April 10, 2015, other law enforcement

officers and I went to the branch of People's Bank in Taos to examine the currency.

A drug detection dog ("Arras") of the New Mexico State Police alerted to the odor

of narcotics emanating from the currency.

c.    On April 10, 2015, law enforcement agents sought to interview RICCO ROMERO

and WILMA ROMERO regarding the source of the $90,000 in United States

currency but were unable to locate either of them.  However, law enforcement

agents encountered RICCO ROMERO's wife, ELENA CARABAJAL, who stated

that MELISSA ROMERO's mother, ABBY MARTINEZ, had put up her residence

as collateral.[1]

d.    I and another law enforcement agents thereafter located and interviewed ABBY

MARTINEZ.

(i)    Although MARTINEZ initially asserted that she had contributed $75,000

cash for IVAN ROMERO's bond from savings that she had accumulated

over several years, she soon recanted and admitted that she had been

deceptive.

(ii)    MARTINEZ said that she would tell the truth.  MARTINEZ then stated

that on April 3, 2015, she encountered MELISSA ROMERO, RICCO

---

[1] Although IVAN ROMERO was released on $90,000 bond as discussed above, he soon violated the conditions of his release, was remanded, and a successive bond was set at $150,000 (in addition to the $90,000 which is still held by the State of New Mexico's Eighth Judicial District Court).  On or about May 17, 2015, RICCO ROMERO produced $150,000 in cash for IVAN ROMERO's bond.  However, IVAN ROMERO, RICCO ROMERO, WILMA ROMERO and MELISSA ROMERO did not have sufficient lawful income or assets to account for that currency (or the $64,920 seized at IVAN ROMERO's residence and the $90,000 in bulk cash used to post IVAN ROMERO's original bond). To conceal the nature, source and ownership of that currency, IVAN ROMERO, RICCO ROMERO and MELISSA ROMERO conspired to have an associate of IVAN ROMERO deliver the $150,000 in bulk United States currency to a branch of People's Bank and exchange that cash for a bank check that was used to post IVAN ROMERO's second bond.

ROMERO and WILMA ROMERO at the home of another of her (MARTINEZ') daughters. MARTINEZ continued that she overheard MELISSA ROMERO, RICCO ROMERO and WILMA ROMERO discussing what they would tell law enforcement if asked where the money for IVAN ROMERO's bond came from. MARTINEZ continued that MELISSA ROMRO, RICCO ROMERO and WILMA ROMERO made up a story that was to be told to law enforcement if asked where the money for IVAN ROMERO's bond came from. MARTINEZ stated she did not in fact put up her house as collateral nor contributed any money towards IVAN ROMERO's bond, but she only said that she had because she had agreed to assist with a cover story.

(*iii*)   MARTINEZ further stated that RICCO ROMERO made statements to the effect that he already possessed half of the money for ROMERO's bond. At the conclusion of that meeting, RICCO ROMERO and WILMA ROMERO left to go to WILMA ROMERO's residence in Arroyo Hondo, New Mexico, to obtain additional money for IVAN ROMERO's bond. MARTINEZ stated that before WILMA ROMERO and RICCO ROMERO departed, they made statements to the effect that the money for IVAN ROMERO's bond belonged to IVAN ROMERO, and that WILMA ROMERO was keeping IVAN ROMERO's money in a safe in her residence. (As noted above, SOI#3 had previously informed law enforcement that IVAN ROMERO kept money and drugs at WILMA ROMERO's residence.)

10

13.     On June 29, 2015, agents executed a federal search warrant at WILMA ROMERO's

residence at #30 Camino Del Albino, Arroyo Hondo, NM.   In the course of that search, agents

found and seized approximately 97.5 grams (net weight) of heroin, packaging material, digital

scales, a small amount of marijuana, ammunition, $73,288 in United States currency, and gold

ingots or coins .

14.     As noted above, SOI#3 has reported that referred to as "Jurassic" served as a courier for the

ROMERO DTO and transported heroin from sources of supply in Albuquerque to IVAN

ROMERO and other members of the ROMERO DTO in Taos.   Law enforcement agents have

identified "Jurassic" as JASON DURAN.  As part of the continuing investigation, law

enforcement agents have conducted electronic surveillance on JASON DURAN.

a.      On October 13, 2015, JASON DURAN's 2002 Ford pickup (displaying New

Mexico registration plate 104- SXZ) drove to, and parked near, the residence of

suspected heroin suppliers in Albuquerque.  I observed JASON DURAN get out of

his truck and enter the residence.  A few minutes later, JASON DURAN emerged

from the residence and returned to his truck.  Surveillance was maintained on

JASON DURAN's 2002 Ford pickup until it arrived at his residence at 2427

Espanola Street, Albuquerque, New Mexico, at approximately 7:33 p.m.  At

approximately 9:20 p.m., JASON DURAN departed from that address in his 2002

Ford Mustang displaying New Mexico registration 104-TDJ.  That vehicle left

Albuquerque traveling northbound on Interstate 25.

b.      I spoke with New Mexico State Police Officer Ron Wood and advised him that

JASON DURAN was traveling towards Taos, New Mexico, and that based upon

the investigation and surveillance outlined above I suspected that JASON DURAN

was transporting heroin to the ROMERO DTO.   Officer Wood had previously

assisted in this investigation and was familiar with the ROMERO DTO.   I

informed Officer Wood the 2002 Mustang was on I-25 traveling north bound, and

requested that he stop the vehicle if he had the opportunity to do so.

c.   At approximately 10:14 p.m., Officer Wood conducted a traffic stop of the 2002

Ford Mustang, on Interstate-25 at approximately milepost 257, northbound, in

Sandoval County, New Mexico, for speeding.

(i)   Officer Wood approached the car and spoke with the driver, PAMELA

VALDEZ (JASON DURAN's girlfriend).   The sole passenger in the car

was JASON DURAN.   Officer Wood asked PAMELA VALDEZ to

produce her driver's license, and she responded that she did not have a

driver's license.   During the traffic stop, PAMELA VALDEZ told Officer

Wood that she and JASON DURAN were traveling to Taos, New Mexico,

to go piñon picking, and that JASON DURAN also intended to scout for elk

in the Taos area.   JASON DURAN told Officer Wood that he was going to

Taos to go elk hunting.

(ii)   After issuing PAMELA VALDEZ a written warning for the speeding

violation and a citation for driving without a license, Officer Wood advised

her that she was free to leave.   As she was returning to the Ford Mustang,

Officer Wood asked PAMELA VALDEZ if he could ask her additional

questions and she agreed.   JASON DURAN subsequently also agreed to

speak with the police officer.   In response to Officer Wood's questions,

PAMELA VALDEZ again stated that she did not know how long they were

12

going to stay in Taos.  Officer Wood had not observed any luggage in the vehicle, and in response to his questions PAMELA VALDEZ stated that she did not have any luggage or toiletries.  She stated that she did not know how long they were going to stay in Taos.   JASON DURAN similarly stated that he did not have any luggage or hunting gear in the vehicle, but he maintained that he had everything at his house in Taos.   Officer Wood observed that JASON DURAN appeared very nervous during his encounter with him that evening.

(iii)   Based upon all of the facts, circumstances and information, Officer Wood suspected that criminal activity was afoot.   Officer Wood asked PAMELA VALDEZ and JASON DURAN for consent to search their vehicle, and both refused.  At that juncture, Officer Wood advised JASON DURAN that he had concerns regarding the purpose of his travel, and that Officer Wood was going to walk his drug detection dog around the exterior of JASON DURAN's car.  Officer Wood then removed his certified drug detection dog, "Arras," from his patrol unit.  Arras conducted a free air sniff of the exterior of the vehicle and alerted to the scent of a controlled substance. Officer Wood searched the vehicle and located several packages of suspected heroin in the glove box with an aggregate gross weight of approximately 131 grams.  Additionally, approximately 10.6 grams (gross weight) of suspected heroin was found in a black purse.  PAMELA VALDEZ and JASON DURAN were arrested and afforded Miranda warnings.

13

d.   Early on October 14, 2015, JASON DURAN gave a post-*Miranda* interview to

investigators at the DEA office in Albuquerque, New Mexico.  JASON DURAN

stated he was directed by RICCO ROMERO a couple of days prior to transport

heroin to Taos for the ROMERO DTO.  JASON DURAN stated RICCO ROMERO

was supposed to pay him $800.00 for delivering the heroin seized from the 2002

Mustang.  JASON DURAN further stated RICCO ROMERO utilizes another

residence to store heroin.  JASON DURAN stated the residence is occupied by an

individually he identified as "Ricky."   JASON DURAN stated that at that

residence RICCO ROMERO has a 3' x 3' safe, which contained heroin.

e.   During the interview on October 14, 2015, JASON DURAN did not divulge the full

scope of his dealings with IVAN ROMERO and the ROMERO DTO.  JASON

DURAN also did not disclose that he had visited the ROMERO DTO's heroin

supplier in Albuquerque before he began his trip to Taos.  Following his release

from custody, JASON DURAN also provided false information to me leading me

to believe that he was attempting to shield his sources of supply and the full scope

of the conspiracy from law enforcement.

f.   On October 21, 2015, I confronted JASON DURAN with the omissions and

inconsistencies in the information that he had provided.  JASON DURAN admitted

that he had not been fully forthcoming and he provided credible information

regarding the ROMERO DTO's suppliers of heroin in Albuquerque consistent with

information and evidence obtained from other sources.  JASON DURAN also

stated the heroin seized on October 13, 2015, was not for the ROMERO DTO  but

was for PAMELA VALDEZ' personal consumption.

g.    Although the heroin seized on October 13, 2015, was not destined for the

ROMERO DTO, JASON DURAN stated that the ROMERO DTO continued to

distribute heroin.  JASON DURAN explained that following IVAN ROMERO's

arrest (April 2, 2015), he continues to run the organization.  However, while IVAN

ROMERO calls the shots, he refrains from touching or possessing heroin.  RICCO

ROMERO has therefore taken charge of handling heroin for the ROMERO DTO.

JASON DURAN continued that RICCO ROMERO has two men working for him

in Taos selling heroin.  JASON DURAN knows one of those men only as "Steve"

and did not know the name of the other man.

15.    Although JASON DURAN initially provided false and incomplete information to me

following the traffic stop on October 13, 2015, when I later confronted him on October 21, 2015,

JASON DURAN admitted that he had not been forthright and provided a more comprehensive and

account of the ROMERO DTO.  Since then, JASON DURAN has provided credible information

regarding the ROMERO DTO that has been corroborated by evidence and information from other

sources.

**Continuing Investigation**

16.    Since October 21, 2015, JASON DURAN has proactively assisted law enforcement in this

investigation.  For example, on November 4, 2015, JASON DURAN met with RICCO ROMERO

at the direction of DEA agents.  JASON DURAN wore a covert recording device during that

meeting which recorded his conversation with RICCO ROMERO.

a.    During the conversation, the men discussed RICCO ROMERO's planned trip to

meet the new source of supply.  RICCO ROMERO informed JASON DURAN that

he was attempting to get ahold of JOE MONTANO for the purpose of making a trip

15

out of town to meet a new source of supply.  RICCO ROMERO further mentioned "Joe" was going to be introducing him to a source of supply for the purpose of obtained a sample of heroin.  RICCO ROMERO continued that the new source of supply was able to produce both pure and cut heroin.  With reference to the new supplier, RICCO ROMERO stated: "we could cut it, throw a little bit of cut, where is still like fire."  I believe RICCO ROMERO was expressing that if they decided to purchase heroin from the new source of supply, they would add a cutting agent and still make it potent enough for customers.

b.    During the conversation, RICCO ROMERO also discussed the ROMERO DTO's prior source of supply of heroin whom they referred to as "homie."  (In earlier text messages between IVAN ROMERO and JASON DURAN that source of supply was also referred to as "homie.")  RICCO ROMERO mentioned he told his brother (who I believe to be IVAN ROMERO), that "the one we get probably had cut in it, the one from [the prior source of supply]."  I believe RICCO ROMERO was making reference to the purity of the heroin provided by the ROMERO DTO's prior supplier.  JASON DURAN asked RICCO ROMERO if he had spoken to "homie."  RICCO ROMERO replied, "na, that's the thing I have to go over there and talk to her."  Later through the conversation, RICCO ROMERO mentioned that he hadn't talked to "homie", and that she had not returned his calls.  RICCO ROMERO further mentioned that he had told her to change her number and maybe that's why she wasn't answering.

c.    RICCO ROMERO and JASON DURAN discussed Steve and Michael.  Based on the recorded conversation and intelligence information gathered during this

investigation, agents have identified "Steve" as STEVEN AGUILAR, a drug

distributor for the ROMERO DTO.  RICCO ROMERO stated that "Steve" had left

town but had returned a few days later and continued to work.  RICCO ROMERO

also stated that "Michael" had also taken off to Colorado and that he was avoiding

RICCO ROMERO.  RICCO ROMERO explained that "Michael" had come up

$600 short and that he had beaten up "Michael." RICCO ROMERO further advised

he convinced "Michael" to return and start working, and that "Michael" did well

for a about week but soon took money and left to Colorado.  RICCO ROMERO

added that he tried again to convince "Michael" to return to work and that he would

allow "Michael" to work off his debt.  RICCO ROMERO stated that he texted

"Michael" and informed him that he would not get beaten up if he continued

working for RICCO ROMERO, but "Michael" had not returned to work.  RICCO

ROMERO noted that threatened to tie up "Michael" and place him in a trunk of a

vehicle, and that he had not heard from "Michael" since then.  RICCO ROMERO

went on to say that in light of the events regarding "Michael," he warned "Steve"

not to mess up.  RICCO ROMERO made statements to the effect that the workers

would earn about two grams a day as their fee for distributing heroin.

17.     Unbeknownst to JASON DURAN, SOI#3 has continued to also provide information to law

enforcement authorities investigating the ROMERO DTO.  This has enabled law enforcement

agents to cross-check and corroborate much of the information supplied by JASON DURAN.

18.     SOI#3 has also proactively assisted in this investigation.  On November 16, 2015, SOI#3

purchased heroin from RICCO ROMERO at the direction of DEA agents.

    a.     Prior to that controlled buy, agents searched SOI#3 and his/her vehicle for

contraband, none was located.  SOI#3 was provided with $700.00 in United States currency to conduct the controlled buy.  At approximately 1:01 p.m., SOI#3 placed a recorded call to RICCO ROMERO known cellular number (575) 779-5806. During the call, SOI#3 asked RICCO ROMERO if he was going to be available to meet.  RICCO ROMERO asked SOI#3 his/her current location and SOI#3 advised s/he was in town.  RICCO ROMERO stated that he would call SOI#3 in about fifteen minutes.  At approximately 1:30 p.m., SOI#3 received a text message from (575) 779-5806, asking  SOI#3 to meet in the area of the Michael's Kitchen, located at 304 Paseo Del Pueblo Norte Taos, New Mexico.

b.      SOI#3 proceeded to 304 Paseo Del Pueblo Norte and waited for RICCO ROMERO to arrive.  At approximately 2:00 p.m., a 2008 Dodge Avenger (displaying New Mexico registration plate MGT-473, and registered to WILMA ROMERO) arrived at the north side of the parking lot.  SOI#3 got into the rear passenger seat of the 2008 Dodge Avenger and purchased $700.00 worth of heroin from RICCO ROMERO.  While agents were unable to see SOI#3 in the 2008 Dodge Avenger, agents monitored a live feed from the recording device that SOI#3 covertly carried during his transaction with RICCO ROMERO.

c.      At the conclusion of that transaction, SOI#3 exited the 2008 Dodge Avenger and departed the area.  SOI#3 met with agents at a predetermined location and relinquished the heroin that he had purchased from RICCO ROMERO.  Agents again searched SOI#3 and his/her vehicle for any other contraband and none was located.  SOI#3 was de-briefed after the buy and s/he stated s/he handed RICCO ROMERO, $700.00 in exchange for heroin.  SOI#3 further stated that ELENA

CARABAJAL and a young child accompanied RICCO ROMERO to the drug deal. On this same date, I tested a small portion of the heroin with a field test kit and received a positive result for the presence of heroin. The weight of the heroin purchased was 14.4 gross grams.

19.     On November 24, 2015, JASON DURAN reported that he met with RICCO ROMERO at 1103 A, Quintana Lane, Taos, New Mexico, on November 22, 2015, seeking additional information regarding the ROMERO DTO's efforts to secure a new source of supply of heroin that they had previously discussed on November 4, 2015.  JASON DURAN reported that RICCO ROMERO provided an update regarding the organizations efforts to secure a new source of heroin: RICCO ROMERO told JASON DURAN that he (RICCO ROMERO), "Ricky" and a woman that he referred to as "Blossom," had traveled to Albuquerque and met with JOE MONTANO to solicit a new heroin source of supply, but JOE MONTANO was unable to secure a new source of supply. However, "Blossom" and an unidentified acquaintance of hers were able to contact an unknown Mexican male who eventually supplied RICCO ROMERO with heroin.

20.     "Ricky" has been identified as RICHARD SANCHEZ.  Telephone toll records show that RICCO ROMERO has been in frequent contact with RICHARD SANCHEZ; telephone toll records show that the telephone known to be used by RICCO ROMERO communicated with RICHARD SANCHEZ' telephone 37 times  from November 4 to 17, 2015. "Blossom" has been identified by agents as BILLY BLOSSOM.  RICCO ROMERO's telephone toll  records show that BILLY BLOSSOM has been in contact with RICCO ROMERO a total of  104 times between November 4, 2015,  and November 17, 2015.  Further, on December 1, 2015, agents conducted surveillance at 1103 A, Quintana Lane, and observed BILLY BLOSSOM in the front porch of RICCO ROMERO's residence.  The telephone toll records and surveillance corroborate JASON

DURAN's reports that RICHARD SANCHEZ and BILLY BLOSSOM are involved with the ROMERO DTO.

21.      While the ROMERO DTO's current supplier of heroin has not been identified, it has become evident that the organization continues to acquire and distribute heroin.  On December 1, 2015, SOI#3 made another controlled buy of $700-worth of heroin from RICCO ROMERO.

      a.      At approximately 12:38 p.m., under the direction of DEA agents, SOI#3 placed a recorded call to the telephone number ((575) 779-5806) of the cellular telephone known to be used by RICCO ROMERO.  ELENA CARABAJAL answered the phone.  During the call, SOI#3 asked her if s/he could stop by.  ELENA CARABAJAL informed SOI#3 that she was not home, but that she would call SOI#3 back as soon as she was ready.  SOI#3 and RICCO ROMERO subsequently exchanged several text messages.  Eventually, RICCO ROMERO  instructed SOI#3 to meet him at a fast food restaurant and then in the parking lot of a commercial business at 814 Paseo Del Pueblo Norte, Taos, New Mexico.  Before that meeting, agents searched SOI#3 and his/her vehicle for contraband with negative results.  SOI#3 was provided with $700 to pay for conduct the heroin that he was to purchase.

      b.      Prior to and during the controlled buy, law enforcement agents conducted surveillance of RICCO ROMERO, his residence, and the location of the transaction.  Surveillance units located the 2008 Dodge Avenger (displaying New Mexico registration plate MGT-473) at a supermarket at 623 Paso Del Pueblo Norte, Taos, New Mexico.  At that time, RICCO ROMERO was identified as the driver of that 2008 Dodge Avenger.  At approximately 2:02 p.m. a DEA agent observed that

2008 Dodge Avenger arrive at RICCO ROMERO's residence at 1103 A, Quintana Lane, El Prado, NM.  The DEA agent observed the 2008 Dodge Avenger park briefly in front of the residence.  A few seconds later, ELENA CARABAJAL emerged from the residence and walked to the driver's side door of the 2008 Dodge Avenger.  The 2008 Dodge Avenger departed from the residence a few seconds later.

c.      At approximately 2:07 p.m., I observed the 2008 Dodge Avenger arrive in the area of 623 Paso Del Pueblo Norte (Taos Video Casa)  where RICCO ROMERO had directed SOI#3 to meet him.  At approximately 2:13 p.m., another agent observed the 2008 Dodge Avenger parked on the south side of the parking lot at that location.  A few minutes later, SOI#3 arrive at the parking lot.  While under surveillance, SOI#3 got out of his/her vehicle, walked  to the 2008 Dodge Avenger, and got into the right rear side of the 2008 Dodge Avenger.  A few minutes later, SOI#3 get out of the 2008 Dodge Avenger and returned to his/her vehicle.  The 2008 Dodge Avenger and SOI#3 both departed from the area.

d.      SOI#3 was followed by agents to a pre-determined location where he relinquished the heroin from SOI#3.  SOI#3 and his/her vehicle were searched for contraband, none was located.  At the pre-determined location, SOI#3 was be-briefed.  SOI#3stated s/he handed RICCO ROMERO $700.00 in exchange for heroin.  SOI#3 stated RICCO ROMERO was accompanied by an individual he/she knows as "Jonesy."  I tested a small portion of the heroin purchased from RICCO ROMERO, utilizing a field test kit, and received a positive result for the presence of heroin.  The gross weight of the heroin purchased was 45.7 grams.

21

22.     I respectfully submit that the facts, evidence and information summarized above establishes probable cause to believe that RICCO ROMERO and RICHARD SANCHEZ have conspired with each other and others to possess with the intent to distribute, and to distribute, controlled substances in violation of 21 U.S.C. §§ 846 and 841(a)(1).

### Evidence Likely to be Found in the Premises to be Searched

23.     Through my training, my experience, and consultation with other law enforcement officers experienced in investigations regarding conspiracy to manufacture, distribute, and possession with intent to distribute controlled substances, I have learned that persons engaged in the illegal drug trade keep drugs, scales, packaging materials, cash, records and other instruments, proceeds and evidence of criminal activity.  Furthermore, through my training and experience persons who traffic in controlled substances are known to keep drugs, currency, and records, in safes, detached storage units, out-buildings, and automobiles.

    a.     Drug traffickers usually maintain an inventory or supply of controlled substances to sustain their illicit business of distributing and selling controlled substances to other persons.

    b.     Drug traffickers often keep instruments paraphernalia for packaging, cutting, mixing, weighing, manufacturing, and distributing controlled substances including, but not limited to, scales, plastic wrap, plastic bags, vacuum sealers, and aromatic substances (such as soap, dryer sheets, wood shavings, heat sealers, and plastic wrapping) which are used to mask the odor of illegal drugs in an attempt to avoid detection by drug detection dogs.

    c.     Drug traffickers commonly utilize telephones, both land-lines and cellular, as a

means of communication to conduct and facilitate their criminal activities.  Such

devices often store or retain telephone numbers and other information that may

identify drug traffickers' associates.

d.      Drug dealers often possess firearms and ammunition to protect themselves and

their drugs and their drug profits.  They also may maintain indicia of firearms such

as receipts for firearms and ammunition, boxes for firearms and ammunition, and

instruction manuals and other documentation for firearms and ammunition.

e.      Drug dealers often take, or cause to be taken, photographs and/or videos of

themselves, their associates, their property, and their drugs.

f.      Drug dealers often travel domestically and internationally to facilitate their trade.

Evidence of foreign and domestic travel by persons engaged in illegal drug

trafficking includes travel itineraries, airline tickets, receipts related to travel such

as rental car receipts, fuel receipts and hotel receipts, and passports and visas and

their contents.

g.      Drug transactions are usually conducted on a cash-basis.   Drug dealers often

accumulate thousands of dollars in cash from the criminal sale of controlled

substances.  Drug dealers often retain that cash to avoid generating currency

transaction reports and to perpetuate and finance their drug trafficking business.

Persons involved in drug trafficking often convert cash proceeds from the sale of

controlled substances into other monetary instruments (such as cashier's checks,

money orders, bank drafts) to disguise and conduct transactions with the criminal

proceeds.  In addition, drug dealers often convert and use the proceeds from the

criminal distribution of controlled substances to purchase other assets such as

precious metals, gems, jewelry, real estate, vehicles, and other valuables.

h.     Evidence of unexplained income and wealth of drug dealers and of the acquisition

and concealment of criminal proceeds can also be found in banking and investment

account statements, credit card account statements, canceled checks, money orders,

deposit slips, check and savings books, business and personal ledgers, accounting

records, safe deposit box records and keys, storage facility records and keys,

federal and state tax records, rental receipts, rental agreements, utility bills,

overnight mail receipts, telephone bills, loan statements records reflecting

ownership of real or personal property (such as deeds of trust or vehicle

registration, insurance, and ownership information), vehicle and property rental

records, lease and purchase agreements, and cancelled mail.

i.     Drug dealers often maintain records of their transactions in a manner similar to the

record keeping procedures of legitimate businesses.  Drug traffickers often

maintain books, records, receipts, notes, ledgers, airline tickets, money orders,

cashier check receipts, and other papers relating to the transportation, ordering, sale,

and distribution of controlled substances.  Further, drug traffickers commonly

"front" drugs (provide controlled substances on consignment) to their clients, and

records are maintained by such drug dealers so they can account for their drugs and

the monies owed for those drugs.  Even after the drugs are sold, documentary

records often remain for long periods of time, even years, to memorialize past

transactions, the status of accounts receivable and accounts payable, and the names

and telephone numbers of suppliers, customers, and co-conspirators.  Such records

can reflect names, addresses and/or telephone numbers of associates and

co-conspirators, the sale and purchase of controlled substances, customer lists, and amounts of money owed to the trafficker by his customers, and by the trafficker to his suppliers. Records often also indicate locations and distribution points of controlled substances, and the purchase of materials, supplies and articles used by the trafficker and co-conspirators in the distribution of controlled substances. Such records frequently include the identification of properties such as real property or vehicles owned, rented, leased, controlled, or otherwise utilized by the trafficker and his co-conspirators in the distribution of controlled substances. These records may include property rental and ownership records such as deed of trust and lease and purchase agreements, and vehicle registration, rental and ownership information. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, IOU's, miscellaneous notes, money orders, customer lists, and telephone address books.

j.      Individuals and organizations involved in the illegal distribution of controlled substances often use computers, tablets, cellular telephones, and other digital devices[2] to document and track their business affairs, including their illicit sales and disposition of the proceeds of their sales. Drug traffickers utilize digital devices that store information that can be of evidentiary value (including records, information, telephone numbers, images and other data). Based upon my knowledge, training and experience, and consultation with other Agents and law

---

[2] A "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; desktop computers; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, memory chips; and security devices.

enforcement personnel, I know that in order to completely and accurately retrieve data maintained on computers and digital media by numerous software programs, to insure accuracy and completeness of such data, and to prevent the loss of the data from accidental or programmed destruction, it is often necessary that some digital devices, peripherals, related instructions in the form of manuals and notes, and software or programs utilized to operate such a device, be seized and subsequently processed by a qualified computer specialist in a laboratory setting.  This is true because of the following:

(i)     Digital devices as described above can store massive amounts of data equivalent to thousands of pages of information.  Additionally, a user may try to conceal criminal evidence by storing it in random order with deceptive file names.  This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site. Searching digital devices for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.

(ii)    Data search protocols are scientific procedures designed to protect the

integrity of the evidence and recover even "hidden," erased, compressed, password-protected or encrypted files.  Since digital evidence is extremely vulnerable to inadvertent or intentional modification or destruction (either from external sources or from a destructive code embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

(*iii*)   Because of the potential volume of the data at issue and the technical requirements set forth above, it is usually necessary for computers, hard drives, and other digital devices and digital and electronic media and its related instructions to be seized and subsequently processed by qualified computer specialists in a laboratory setting.

(*iv*)   Based upon my knowledge, training and experience and the experience of other law enforcement personnel, I know the searches and seizures of evidence from computers taken from the subject premises commonly require agents to seize storage devices and media as well as the central processing units (CPUs).   It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above.  In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any application software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation.  Without these items, it may be difficult to recreate the digital environment in which the seized data was created.  This is

27

important both for thorough analysis and for establishing the ultimate integrity of the seized data.

(v)     In addition, I believe that it is likely that contemporaneous analyses of computers, hard drives and other digital devices and digital and electronic media will be impractical and extremely time consuming.  For that reason, it will be necessary to remove these items so as to facilitate an off-site analysis to locate evidence authorized to be seized by this search warrant. Therefore, I request authorization to seize such items for off-site analysis to locate evidence authorized to be seized by the search warrant.

24.     Through my training, my experience, and consultation with other law enforcement officers experienced in investigations regarding conspiracy to manufacture, distribute, and possession with intent to distribute controlled substances, I have learned that drug traffickers often keep controlled substances, large sums of currency, records, and other information and evidence regarding their criminal activities and transactions in locations where drug traffickers have ready access to them. It is common for drug dealers to keep contraband, proceeds of drug sales and/or records of drug transactions, drug sources of supply, and drug customers in secure locations within residences. Drug traffickers often keep such evidence, instruments and proceeds of their criminal activities outside of their own residences to avoid detection and seizure by officers executing search warrants at their homes.  Drug traffickers are known to keep controlled substances, currency, and evidence of their criminal transactions and associations at stash houses, houses owned by criminal associates, garages, storage buildings, safes, vaults, safe deposit boxes, vehicles, and obscure locations such as storage containers buried underground in order to conceal such items from law

enforcement authorities.  Persons involved in drug trafficking often conceal caches of drugs, large

amounts of currency, financial instruments, and records of their activities and transactions in

residences, businesses, offices, safes, vaults, safe deposit boxes, garages, storage buildings,

out-buildings, and vehicles.

25.     In this investigation, I have learned that the ROMERO DTO maintains substantial amounts

of heroin and large sums of currency.  As summarized above: the search of IVAN ROMERO's

residence conducted on April 2, 2015, yielded 305.2 grams (net weight) of heroin, marijuana, drug

trafficking instruments and paraphernalia and  $64,920; the search of WILMA ROMERO's

residence on June 29, 2015, yielded 97.5 grams (net weight) of heroin, a small amount of

marijuana, ammunition, drug trafficking instruments, $73,288 in United States currency and gold

ingots or coins.  In the wake of those searches and seizures, SOI#3 and JASON DURAN have

reported that RICCO ROMERO has assumed managerial control of the ROMERO DTO's and

currently conducts its heroin trafficking business.

26.     When JASON DURAN was initially debriefed on October 14, 2015, he mentioned that the

ROMERO DTO had a safe at "Ricky's" residence where drugs and money were kept.  In

subsequent interviews, JASON DURAN provided additional detail and identified "Ricky" as

"Ricky Sanchez."  As noted above, law enforcement agents have determined that "Ricky" is

RICHARD SANCHEZ, and telephone toll records show that he has been in frequent contact with

RICCO ROMERO.  JASON DURAN has reported that he has personally seen the safe at

RICHARD SANCHEZ' residence containing large amounts of money and heroin belonging to the

ROMERO DTO.  Although JASON DURAN could not provide a street address for the residence,

he provided a detailed description of the residence and its location off of Upper Ranchitos Road,

Taos, New Mexico.  With the description JASON DURAN provided, I was able to locate the

residence of RICHARD SANCHEZ at 505 Upper Ranchitos Road, Taos, New Mexico.

RICHARD SANCHEZ' driver's license records and law enforcement databases show that he

resides at 505 Upper Ranchitos Road, Taos, NM.   I presented a photograph to JASON DURAN of

RICHARD SANCHEZ' residence, and JASON DURAN was able to positively identify that as the

"Ricky's" residence in which the ROMERO DTO maintains a safe and keeps heroin and money.

27.     As discussed above, through my experience and training I have learned that drug

traffickers often maintain drugs, drug proceeds, and instruments of their criminal enterprise in

their homes.   In this case, such evidence has previously been seized from the homes of IVAN

ROMERO and WILMA ROMERO.   JASON DURAN has reported that RICCO ROMERO now

keeps a supply of heroin and money in a safe in the residence that he shares with ELENA

CARABAJAL at 1103 A, Quintana Lane, El Prado, New Mexico.   JASON DURAN's reports

have been corroborated by the events preceding the controlled buy from RICCO ROMERO on

December 1, 2015.   Before selling heroin to SOI#3 on that date, RICCO ROMERO drove to his

home where ELENA CARABAJAL briefly met him outside.   Based on the circumstances and

preceding communications between SOI#3 and ELENA CARABAJAL and RICCO ROMERO, I

believe that RICCO ROMERO returned home before meeting with SOI#3 to pick up the heroin

that he later sold to SOI#3.   Based on my experience and training, the information provided by

JASON DURAN, and the events preceding the controlled buy on December 1, 2015, I respectfully

submit that there is probable cause to believe that evidence, instruments and proceeds of the

conspiracy to possess with the intent to distribute, and to distribute, controlled substances are

located in RICCO ROMERO's residence.

28.     Additionally, as discussed above, through my experience and training I have learned that

drug traffickers also keep controlled substances, money, and other evidence of their criminal

enterprise in their vehicles.  RICCO ROMERO is known to use a 2008 Dodge Avenger displaying New Mexico registration plate MGT-473 that is registered to WILMA ROMERO.  Moreover, as illustrated during the controlled buy on December 1, 2015, RICCO ROMERO uses that vehicle to distribute controlled substances.  Based upon my experience and training and the facts and circumstances summarized above, I respectfully submit that there is probable cause to believe that evidence of RICCO ROMERO's distribution of controlled substances may be found in that 2008 Dodge Avenger.

CONCLUSION

29.     Based on the facts and circumstances summarized herein, I respectfully submit that there is probable cause to believe that, RICCO ROMERO has conspired with IVAN ROMERO, WILMA ROMERO, RICHARD SANCHEZ, and others to possess with the intent to distribute, and to distribute, controlled substances in violation of 21 U.S.C. §§ 846 and 841(a)(1).

30.     Further, I also respectfully submit that there is probable cause to believe that evidence, contraband, fruits and instrumentalities of those crimes (described in Appendix D) will likely be found at:

    a.     1103 A, Quintana Lane, El Prado, New Mexico (RICCO ROMERO's residence further described in Appendix A),

    b.     505 Upper Ranchitos Road, Taos, New Mexico (RICKY SANCHEZ' residence further described in Appendix B), and

    c.     a 2008 Dodge Avenger displaying New Mexico registration plate MGT-473 (a motor vehicle used by RICCO ROMERO further described in Appendix C).

31.     WHEREFORE, I respectfully request that a warrant be issued authorizing any agent of the

Drug Enforcement Administration, with assistance of other law enforcement personnel, to enter

and search those premises for evidence, contraband, fruits and instrumentalities of violations of 21

U.S.C. §§ 841(a)(1) and 846.

      I swear that the information set forth above is true and correct to the best of my knowledge.

 

Kevin M. Mondragon
Special Agent
Drug Enforcement Administration


Subscribed to and sworn to
before me, this 17th of December, 2015

United States Magistrate Judge
Albuquerque, New Mexico

## **APPENDIX A**
### **Premises To Be Searched**

The premises to be searched consists of the real property, improvements and curtilage situated at 1103 A, Quintana Lane, El Prado, Taos County, New Mexico.

The premises to be searched includes a light brown mobile home with dark brown skirting (the known residence of ELENA CARABAJAL and RICCO ROMERO). The front door of the mobile home faces west and has a small wooden porch attached to it. The front door is protected by a red steel door with the numbers and letter "1103 A" displayed in green and white lettering and numbers to the right as one faces the red steel door. The mobile home has four windows on the west side with dark trim around them. On the east side of the mobile home there is a brown secondary door facing east. There is also a black satellite dish device affixed to the roof on the west side. There is a large window on the south side of the mobile home. Directly above the south window the word "Windsor" is affixed to the wood trim. There is also an air conditioning system affixed to the roof. The mobile home is depicted below.



The premises to be searched also includes any garages, storage sheds, and outbuildings at 1103 A, Quintana Lane, El Prado, Taos County, New Mexico.

# APPENDIX B
## Premises to Be Searched

The premises to be searched consists of the real property, improvements and curtilage situated at 505 Upper Ranchitos Road, Taos, Taos County, New Mexico.

The premises to be searched includes a gray stucco single residence with light grey pro-panel affixed to the roof (the known residence of RICHARD SANCHEZ (a.k.a. "Ricky"). The roof trimming is white. The front door is glass with brown wood trimming. On the east side of the residence there are two windows. The window to the right side of the front door is broken and is covered with a white piece of plastic. Between the front door and the broken window there is a light affixed to the wall. On the north side of the residence, there is a wooden fence attached to the residence. The residence is depicted below.



The premises to be searched also includes any garages, storage sheds and outbuildings situated at 505 Upper Ranchitos Road, Taos, Taos County, New Mexico.

# APPENDIX  C
## Premises To Be Searched

The premises to be searched is a gray 2008 Dodge Avenger, Vehicle Identification
Number (VIN) 1B3LC46K98N221858, displaying New Mexico registration plate MGT-
473 registered to WILMA ROMERO.

## APPENDIX  D

## Items To Be Seized

1.  Controlled substances (other than any controlled substances prescribed by an authorized health care provider).

2.  Drug trafficking instruments and paraphernalia for packaging, cutting, mixing, weighing, manufacturing, and distributing controlled substances.  Such instruments and paraphernalia include, but are not limited to, scales, plastic wrap, plastic bags, vacuum sealers, and aromatic substances.

3.  Telephones, paging devices, any other telecommunications instruments, contracts with communication service providers, invoices and bills for communication services, and telephone toll records.

4.  Firearms and ammunition;

5.  Photographs, videos or other images or depictions of the subjects of investigation, their associates, their property, and controlled substances.

6.  Records and other evidence of travel including itineraries, airline tickets, receipts related to travel such as rental car receipts, fuel receipts and hotel receipts, and passports and visas and their contents.

7.  Currency, monetary instruments, precious metals, gems, jewelry, real estate records, and other items of value and evidence of assets which may represent the proceeds of criminal drug distribution or evidence unexplained wealth.

8.  Records, documents, statements and information in any form pertaining to bank accounts, credit card accounts, safe deposit boxes, money orders, cashier's checks, bank drafts, money remittance records, receipts, business and personal ledgers, accounting records, safe deposit box records and keys, storage facility records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property, and other evidence of financial transactions, property, assets, or unexplained wealth.

9.  Records, documents and information in any form pertaining to controlled substance transactions including ledgers, drug transactions, account books, notes, names and/or code names or nicknames and/or identifying information pertaining to customers, amounts of drugs bought and sold, amounts of money paid, owed or collected,  and appointment calendars.

10.  Records, evidence and information indicating ownership or control over  real property and personal property including motor vehicles.

11.   Computers, tablets, cellular telephones, and other digital devices which may hold the records, lists, information or evidence described above.  A "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; desktop computers; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, memory chips; and security devices.   Peripherals, related instructions in the form of manuals and notes, and software or programs utilized to operate digital devices may also be seized.

Computers, hard drives, and other digital devices, digital media and peripherals may be seized and  subsequently processed by a qualified computer specialist in a laboratory setting in order to completely and accurately retrieve data and prevent the loss of the data from accidental or programmed destruction.